JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Octavia Motley, as Administratrix of the Estate of T.M., a minor, dec'd, (see attached sheet for additional plaintiffs)

**DEFENDANTS**
Jason P. Eckman, Daniel S. Sgambato, and Pennsylvania State Police Officers John Does Nos. 1-20

**(b)** County of Residence of First Listed Plaintiff  Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Delaware
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Thomas R. Kline, Esq; David K. Inscho, Esq.;Wyatt J. Larkin, Esq; 1525 Locust St., Philadelphia, PA 19102

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer |
| ☐ 8 Multidistrict Litigation - Direct File | |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §§ 1367, 1391
Brief description of cause:
Injuries and Deaths of passengers in a vehicle being chased by Pennsylvania State Police Troopers

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.   DEMAND $   CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*  JUDGE _____  DOCKET NUMBER _____

DATE
Oct 29, 2024

SIGNATURE OF ATTORNEY OF RECORD
*David K. Inscho*

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____

Plaintiffs:

ERICA M. BILLUPS, as Administratrix of the Estate of KA-LYN S. BILLUPS, DECEASED

AND

KRYSTAL PEARSON, as Parent and Natural Guardian of K.P., a minor,

AND

KEMONE MANNING

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**

Place of Accident, Incident, or Transaction: Route 322, Upper Chichester Twp., Pennsylvania

---

***RELATED CASE IF ANY:*** Case Number:_____ Judge:_____

1. Does this case involve property included in an earlier numbered suit?                                      Yes ☐

2. Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?      Yes ☐

3. Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?   Yes ☐

4. Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?   Yes ☐

5. Is this case related to an earlier numbered suit even though none of the above categories apply?           Yes ☐
   If yes, attach an explanation.

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☑ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Wage and Hour Class Action/Collective Action
- ☐ 6. Patent
- ☐ 7. Copyright/Trademark
- ☐ 8. Employment
- ☐ 9. Labor-Management Relations
- ☒ 10. Civil Rights
- ☐ 11. Habeas Corpus
- ☐ 12. Securities Cases
- ☐ 13. Social Security Review Cases
- ☐ 14. Qui Tam Cases
- ☐ 15. Cases Seeking Systemic Relief  **see certification below**
- ☐ 16. All Other Federal Question Cases. *(Please specify)*:_____

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify)*:_____
- ☐ 7. Products Liability
- ☐ 8. All Other Diversity Cases: *(Please specify)*_____
  _____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☑ **does not** have implications beyond the parties before the court and ☐ **does** / ☑ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

**ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)**

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### <u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>

Octavia Motley, as Administratrix of the Estate of T.M., a minor, deceased,     :                 CIVIL ACTION
Erica M. Billups, as Administratrix of the Estat e of Ka-Lyn Billups, deceased,    :
Krystal Pearson, Parent and Natural Guardian of K.P., a minor, and Kemone   :
Manning                             v.                      :
                                                      :
Jason P. Eckman, Daniel S. Sgambato, and Pennsylvania State Police        :              NO.
John Doe Nos. 1 through 20

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.       ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.         ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                            ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| October 29, 2024 | David K. Inscho, Esquire | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-772-1436 | 215-792-5522 | david.inscho@klinespecter.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**



## Civil Justice Expense and Delay Reduction Plan
### Section 1:03 - Assignment to a Management Track

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

### SPECIAL MANAGEMENT CASE ASSIGNMENTS
### (See §1.02 (e) Management Track Definitions of the
### Civil Justice Expense and Delay Reduction Plan)

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.


American LegalNet, Inc.
www.FormsWorkFlow.com

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)          The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)          In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)          The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)          Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)          Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation" as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues.  See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.


American LegalNet, Inc.
www.FormsWorkFlow.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **OCTAVIA MOTLEY, as Administratrix of the Estate of T.M., a minor, DECEASED**<br>c/o Kline & Specter, P.C.,<br>1525 Locust Street, Philadelphia, PA 19102;<br><br>AND<br><br>**ERICA M. BILLUPS, as Administratrix of the Estate of KA-LYN S. BILLUPS, DECEASED**<br>c/o Kline & Specter, P.C.,<br>1525 Locust Street, Philadelphia, PA 19102<br><br>AND<br><br>**KRYSTAL PEARSON, as Parent and Natural Guardian of K.P., a minor,**<br>c/o Kline & Specter, P.C.,<br>1525 Locust Street, Philadelphia, PA 19102<br><br>AND<br><br>**KEMONE MANNING**<br>c/o Kline & Specter, P.C.,<br>1525 Locust Street, Philadelphia, PA 19102<br><br>*Plaintiffs*,<br><br>v.<br><br>**JASON P. ECKMAN,**<br>**in his individual and official capacity**<br>c/o Pennsylvania State Police, Troop K,<br>2201 Belmont Avenue, Philadelphia, PA 19131<br><br>AND<br><br>**DANIEL S. SGAMBATO,**<br>**in his individual and official capacity**<br>c/o Pennsylvania State Police, Troop K,<br>2201 Belmont Avenue, Philadelphia, PA 19131<br><br>AND<br><br>**PENNSYLVANIA STATE POLICE OFFICERS JOHN DOE NOs. 1 THROUGH 20**<br>1800 Elmerton Avenue<br>Harrisburg, PA 17110<br><br>*Defendants*. | **FILED PURSUANT TO**<br>**28 U.S.C. §§ 1367, 1391**<br><br>CIVIL ACTION NO.   2:24-cv-05763<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## CIVIL ACTION – COMPLAINT

Plaintiffs, Octavia Motley, as Administratrix of the Estate of T.M., a minor, deceased, Erica M. Billups, as Administratrix of the Estate of Ka-Lyn S. Billups, deceased, Krystal Pearson, as Guardian of Plaintiff K.P., a minor, and Kemone Manning, by and through their attorneys, Kline & Specter, P.C., allege as follows:

1.     Plaintiff Octavia Motley, as Administratrix of the Estate of T.M., a minor, deceased, is an adult citizen July 10, 2024, Octavia Motley was appointed Administrator of the Estate of T.M., a minor, deceased at age 17, who was Ms. Motley's daughter.

2.     Plaintiff Erica M. Billups, as Administratrix of the Estate of Ka-Lyn S. Billups, deceased, is an adult citizen of the Commonwealth of Pennsylvania. By Letters of Administration Granted on May 15, 2024, Erica Billups was appointed Administrator of the Estate of Ka-Lyn S. Billups, deceased, who was Ms. Billups' daughter.

3.     Plaintiff Krystal Pearson, as Parent and Natural Guardian of K.P., a minor, is an adult citizen of the Commonwealth of Pennsylvania. She brings this action on behalf of her daughter, Plaintiff K.P., a minor.

4.     Plaintiff Kemone Manning is an adult citizen of the Commonwealth of Pennsylvania.

5.     Defendant Jason P. Eckman ("Trooper Eckman") is an adult citizen of the Commonwealth of Pennsylvania and was at all relevant times a State Trooper with the Pennsylvania State Police, Troop K, whose business address is 2201 Belmont Avenue, Philadelphia, PA 19131.

6.     Defendant Daniel S. Sgambato ("Trooper Sgambato") is an adult citizen of the Commonwealth of Pennsylvania and was at all relevant times a State Trooper with the Pennsylvania State Police, Troop K, whose business address is 2201 Belmont Avenue, Philadelphia, PA 19131.

7.     At all material times, Trooper Eckman and Trooper Sgambato provided law enforcement services to the Pennsylvania State Police ("PSP") and were acting under color of state law.

8.     At all material times, Trooper Eckman and Trooper Sgambato were assigned to PSP Troop K's Media station, were responsible for patrolling the area, and were familiar with the road conditions and traffic patterns where the material events transpired.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1367(a), as Plaintiffs' claims arise under The Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and, thus, this matter falls under the Court's original jurisdiction.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants can be found in, reside, or transact business in this District.

11.     Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

## MATERIAL FACTS

12.     On April 24, 2024, Plaintiffs K.P. and Kemone Manning, and Plaintiffs' decedents T.M. and Ka-Lyn S. Billups, were riding in the back seat of a red Ford Taurus driven by Isaiah Miller, along with two additional passengers, Bishop Young and Ikeam Castlebury-Rogers.

13.     At approximately 1:20 PM, the car pulled into the parking lot of The Shoppes at Brinton Lake, a shopping center located at 949 Baltimore Pike, Glenn Mills, PA 19342.

14.     After stopping, the Plaintiffs and other occupants got out of the car and began to look for personal items that had been misplaced in the vehicle while driving.

15.     The Plaintiffs and other occupants of the vehicle never entered any of the stores located at The Shoppes at Brinton Lake.

16.     While other occupants were looking through the car, the occupants noticed a suspicious vehicle, a grey sedan, in the area around their parking space.

17.     After noticing the suspicious vehicle, the occupants got back into the car and drove out of the parking lot, headed northbound on North Brinton Lake Road.

18.     The Plaintiffs and Plaintiffs' decedents were all passengers in the back seat of the red Ford Taurus.

19.     The grey sedan was an unmarked Pennsylvania State Police vehicle driven by Defendant Trooper Sgambato.

### Trooper Sgambato Initiates a Traffic Stop and Gives Chase

20.     Trooper Sgambato followed the red Ford Taurus on North Brinton Lake Road for approximately half a mile.

21.     At 1:25:30 PM, Trooper Sgambato initiated a traffic stop of the red Ford Taurus driven by Miller.

22.     After Trooper Sgambato initiated the stop, Miller continued northbound for 30 seconds, traveling approximately a quarter mile, before pulling over at the corner of North Brinton Lake Road and Mill Road.

23.     Trooper Sgambato was stopped on the side of the road for more than one minute behind the red Ford Taurus which had pulled over in front of the unmarked vehicle.

24.     At approximately 1:26:40 PM, Trooper Eckman arrived at the corner of North Brinton Lake Road and Mill Road and stopped behind Trooper Sgambato's vehicle.

25.     At 1:26:50 PM, Miller drove away from the traffic stop initiated by Trooper Sgambato.

26.     Troopers Sgambato and Eckman gave chase to Miller on Mill Road, a narrow, two-lane residential street with a speed limit of 35 mph, passing at least two vehicles driving in the opposite direction and driving well in excess of the speed limit.

27.     At 1:27:29 PM, while pursuing Miller eastbound on Mill Road, Trooper Sgambato radioed in his chase to PSP dispatch, describing the pursuit as pursuant to a traffic violation.

28.     At all material times, the radio frequency on which PSP Troopers radioed dispatch was open to and could be heard by other Troopers engaged in the chase.

29.     Miller then turned right onto Thornton Road and continued southbound.

30.     Troopers Sgambato and Eckman continued their pursuit of Miller on Thornton Road—which was also narrow, two-lane residential street with a speed limit of 35 mph—passing at least two vehicles driving in the opposite direction and swerving into the oncoming lane of traffic to avoid a third vehicle headed in the same direction.

31.     At 1:28:26 PM, Miller turned right onto Baltimore Pike and continued westbound.

32.     Troopers Sgambato and Eckman continued their pursuit of Miller on Baltimore Pike, a six-lane road with a speed limit of 45 mph, for approximately half a mile.  Baltimore Pike is a busy roadway that in the middle of the day had substantial vehicular traffic.

33.     At 1:28:50, upon reaching the intersection of Baltimore Pike and U.S. Route 322 Conchester Highway ("Route 322"), Miller turned left across three lanes of oncoming traffic that had a green light, forcing cars to stop ahead of the intersection to avoid a collision.



34.     While crossing the intersection, Miller narrowly avoided hitting several cars and a traffic post.

35.     Troopers Sgambato and Eckman closely followed Miller into this dangerous turn through the intersection of Baltimore Pike and Route 322 cutting off multiple lanes of traffic that had a green light.

36.     At the time Miller and Troopers Sgambato and Eckman crossed the intersection of Baltimore Pike and Route 322, over three minutes had transpired since Trooper Sgambato initiated the traffic stop and over two minutes had transpired since Trooper Eckman arrived at the site of the initial traffic stop.

37.     At the time Miller and Trooper Sgambato crossed the intersection of Baltimore Pike and Route 322, approximately 30+ other vehicles were stopped at or traveling through the intersection.

6

38.     Immediately after Miller and Trooper Sgambato crossed the intersection, Miller drove onto a grass island separating eastbound Baltimore Pike from its right turn lane.

39.     As Miller's vehicle was driving over the sidewalk onto the grass island, Trooper Sgambato slowed his vehicle, before ramming the left rear bumper of Miller's vehicle.



40.     Upon impact from Sgambato's unmarked cruiser, Miller's vehicle shifted orientation to the left.

41.     Miller then accelerated through the grass island, narrowly missing a pedestrian, who was forced to jump out of the way.



42.    Trooper Sgambato, continuing the pursuit, swerved left to avoid the pedestrian, who had fallen in the street next to the grass island.

43.    As Miller's red Ford Taurus accelerated out of the grass island, a passenger in the back seat opened the right rear door in an attempt to jump out of the vehicle before the chase could continue.



8

44.     Before a rear seat passenger could get out of the vehicle, Miller accelerated, rendering it unsafe to jump out of the vehicle, and the passenger closed the door.

45.     Throughout the chase, Plaintiffs and Plaintiffs' decedents pleaded with Miller to stop the car.  However, the Troopers continued to pursue the red Ford Taurus and Miller continued to drive away from them.

46.     After the attempt by the back-seat passenger to open the door, Troopers Sgambato and Eckman were aware that passengers in the red Ford Tarus did not want the chase to continue.

### Trooper Eckman Takes Over the Chase

47.     At 1:29 PM, as Miller accelerated out of the grass island onto Route 322, Trooper Eckman intercepted Miller in his marked PSP cruiser and assumed the lead on the chase, pursuing Miller eastbound on Route 322.

48.     Trooper Sgambato continued the chase, following behind Trooper Eckman.

49.     The portion of Route 322 east of Baltimore Pike was a four-lane road with a speed limit of 45 mph and businesses, a hotel, and a church located along the road. It is a busy roadway in the midday.

50.     Seven seconds later, at 1:29:07 PM, PSP Trooper Andrew Korrubin ("Trooper Korrubin") radioed PSP dispatch, saying that he was setting up a spike strip, a device used to disable fleeing vehicles by puncturing the tires, on Route 322.

51.     Approximately ten seconds later, as Trooper Eckman closed in on Miller's vehicle, Miller accelerated, driving though a red light at the intersection of Route 322 and Evergreen Drive.



52.     As Miller, Trooper Eckman, and Trooper Sgambato drove through the red light, several cars were traveling through the intersection of Route 322 and Evergreen Drive, which contained the entrance to a large shopping center.

53.     Troopers Eckman and Sgambato continued the pursuit of Miller eastbound on Route 322.

54.     After passing through the intersection of Route 322 and Station Road/Fellowship drive, Trooper Sgambato radioed dispatch, at 1:29:36 PM, stating that Miller's vehicle speed was approximately 110 mph.

55.     Trooper Eckman attempted to match Miller's speed, and Sgambato followed 3-5 car lengths behind Eckman.

56.     At 1:29:56 PM, approximately five minutes after Trooper Sgambato initiated the stop, Miller, Trooper Eckman, and Trooper Sgambato began to encounter increased traffic on Route 322, passing a SEPTA bus, a semi-truck, and several passenger vehicles.



57.    At the three-way intersection of Route 322 and Cambridge Drive, Miller, Trooper Eckman, and Trooper Sgambato swerved at high speed around three cars headed eastbound on Route 322.

58.    Miller, Trooper Eckman, and Trooper Sgambato then drove between two passenger vehicles at high speed, forcing one to pull off to the side of the road.

59.    At 1:30:22 PM Trooper Sgambato then radioed dispatch to report that Miller's speed was approximately 70 mph.

60.    Miller, Trooper Eckman, and Trooper Sgambato then drove through the intersection of Route 322 and Mattson Road/Featherbed Lane at approximately 70 mph.

61.    Approximately 30+ vehicles were stopped at or traveling through the intersection of Route 322 and Mattson Road/Featherbed Lane while Miller, Trooper Eckman, and Trooper Sgambato drove through it at approximately 70 mph.

### Route 322 Narrows to a Two-Lane Road and the Chase Ends in a Crash

62.    Approximately one quarter mile east of the intersection of Route 322 and Mattson Road/Featherbed Lane, Route 322 narrows to a two-lane road.

11

63.     As Route 322 narrowed to a two-lane road, Miller drove around several passenger vehicles, placing these vehicles in between him and Troopers Eckman and Sgambato.

64.     While traveling the quarter mile east of the Route 322 and Mattson Road/Featherbed Lane intersection, Miller, Trooper Eckman, and Trooper Sgambato passed ten passenger vehicles also headed east on Route 322.

65.     At 1:30:40 PM, as Route 322 narrowed to two lanes, Troopers Eckman and Sgambato drove into the painted center median to avoid traffic and continue the pursuit.



66.     Miller, Trooper Eckman, and Trooper Sgambato then again weaved between two passenger vehicles at high speed, forcing one to pull off to the side of the road.



67.     Troopers Eckman and Sgambato then drove onto the right-side shoulder of Route 322, passing nine additional vehicles.

68.     At 1:31:02 PM, Troopers Eckman and Sgambato crossed the center dividing line in order to drive around eastbound cars between his vehicle and Miller's before returning to the eastbound lane.

69.     Troopers Eckman and Sgambato then drove around eight additional eastbound vehicles forced to pull to the side of the road or into turn lanes.



70.     At 1:31:26 PM. Troopers Eckman and Sgambato drove onto the right-side shoulder in order to drive around two additional vehicles, at which time they caught up to Miller's red Ford Taurus and re-entered the eastbound lane.

71.     At 1:31:31 PM, Trooper Eckman accelerated through the right-side shoulder of the road and attempted to close the gap further, which would have placed Trooper Eckman in a position to initiate a precision immobilization technique (PIT maneuver)—a technique whereby a police vehicle strikes the fleeing vehicle in a way that causes the driver to abruptly turn sideways, lose control, and stop.





72.    At the time of this attempted PIT maneuver, there were multiple other vehicles in

the immediate area.

73.    Miller responded to Trooper Eckman's advance by increasing his speed, as Miller

had done several times in response to encroachment by Troopers Sgambato and Eckman, after

Trooper Sgambato initially rammed the red Ford Taurus earlier in the chase.

74.     For the following 34 seconds, Troopers Eckman and Sgambato pursued Miller at increasingly high speed.

75.     At approximately 1:32:00 PM, Miller encountered a line of three vehicles headed east on Route 322.

76.     Miller attempted to swerve around the rear two vehicles in the line, entering the right-side shoulder.

77.     As he was swerving back into the eastbound lane, Miller lost control of the vehicle, clipped the front of the second vehicle, and crashed head-on into a concrete barrier on the westbound shoulder at 1:32:02 PM.

78.     The impact lifted the red Ford Taurus into the air before crashing back down on its four wheels.



79.     Troopers Eckman and Sgambato then stopped their vehicles, followed shortly thereafter by other PSP vehicles who had joined the rear of the chase.

80.     No PSP vehicles crashed, and no PSP Troopers were injured during the pursuit.

**Aftermath of the Crash**

81.     Upon impact, the front of the red Ford Taurus immediately caught fire.

82.     Plaintiff Manning then climbed through the opening where the front windshield had

been before it shattered, sustaining burns on her back.



83.     Troopers on scene used fire extinguishers to suppress the fire.

84.     At 1:37:39 PM, a fire truck with a local department arrived. Fire fighters

extinguished the fire and began to extricate additional passengers.

85.     At approximately 1:44 PM two ambulances arrived on scene.

86.     Isaiah Miller, the driver, was pronounced dead at the scene.

87.     Ikeam Castlebury-Rogers, who was sitting in the front passenger seat of the vehicle,

was pronounced dead at the scene.

88.     Plaintiff's decedent Ka-Lyn Billups, who was seated in the back of the vehicle, was

pronounced dead at the scene.

89.     Plaintiff's decedent T.M., a minor, who was seated in the back seat, was transported to Crozer Chester Medical Center with severe injuries.

90.     At the time, T.M. was approximately six months pregnant.

91.     At the hospital, T.M. was diagnosed with multiple traumatic injuries, including a ruptured uterus, and suspected internal bleeding.

92.     At the hospital, doctors performed an emergency C-section, and the baby boy fetus was removed from T.M. and pronounced dead.

93.     At 11:30 PM on the same day, T.M. succumbed to her injuries and was pronounced dead.

94.     Minor-Plaintiff K.P., then age 16, who was seated in the back seat, was air-lifted to Thomas Jefferson University Hospital with severe injuries.

95.     K.P. was transferred to the Children's Hospital of Philadelphia, where she was treated for multiple traumatic injuries including thoracic compression fractures to her Left T1 vertebra facet, T3, T4, T5 vertebrae, and T6 vertebra superior endplate; fracture of cervical C1 vertebra; posterior left 1st rib and lateral left 8th rib fractures; left ankle fracture; left clavicle fracture; facial lacerations; and a TBI (traumatic brain injury).

96.     Plaintiff Kemone Manning, then age 17, who was seated in the back seat, was transported to DuPont Nemours Children's Hospital in Delaware.

97.     Plaintiff Manning sustained serious traumatic injuries causing significant pain and long-term loss of mobility, as well as burns and permanent disfigurement from scarring.

98.     In a press release issued on or about April 24, 2024, attached as **Exhibit A**, the Pennsylvania State Police stated that PSP troopers were "conducting stationary patrol of the Brinton Lake Shopping Center" and claimed that one of the passengers was "believed to be

18

involved in a previous retail theft at the shopping center."

99.     Several local news reports in which PSP's press release and/or public information officers are quoted also contain statements from anonymous sources falsely accusing Plaintiffs and Plaintiffs' decedents of shoplifting at Lululemon on the date of the chase.

100.    At 1:28:05 PM, as Trooper Eckman took lead on the chase, PSP call logs record his unit as responding to "ATTEMPTED RETAIL" theft.

101.    Upon information and belief, a police dispatcher stated during the chase that "PSP is in pursuit of a red Taurus, tinted windows, for attempted…for a theft on Lululemon."

102.    At no point on April 24, 2024, did Plaintiffs or Plaintiffs' decedents enter Lululemon or any other store in The Shoppes at Brinton Lake, nor did Plaintiffs or Plaintiffs' decedents shoplift.

103.    At no other point in time did Plaintiffs or Plaintiffs' decedents shoplift from Lululemon or any other store at The Shoppes at Brinton Lake.

104.    None of the surviving passengers were arrested or charged with any crime.

105.    All allegations against Plaintiffs and Plaintiffs' decedents of theft or any other wrongdoing are false, baseless, and hereby denied.

106.    The PSP press release, **Exhibit A**, claims that after the red Ford Taurus left the shopping center, it was "observed to have a tinted front windshield, expired inspection stickers, and a Delaware temporary paper registration obscured by a tinted license cover."

107.    In an interview with NBC News 10 on or about May 2, 2024, accompanying article attached as "**Exhibit B**" PSP Communications Director Lt. Adam Reed stated that the occupants of the red Ford Taurus "were acting suspiciously" and that "the reason for the stop was going to be the…equipment violations" listed in in the PSP press release.

108.    The PSP has since removed the press release from its website.

109.    At all material times, the PSP had established policies governing police pursuits codified in its Field Regulations. The relevant portions of PSP Field Regulations are not public.

110.    According to Lt. Adam Reed, as reported in **Exhibit B**, PSP Pursuit policy "does allow" PSP Troopers to pursue a fleeing suspect vehicle regardless of the suspected violation, and that Troopers engaging in a pursuit must weigh their duty to apprehend a violator against the risk to public safety.

111.    Upon information and belief, relevant PSP Field Regulations require a Trooper deciding whether to continue a pursuit to weigh the risk to public safety created by the pursuit against the risk to public safety created by allowing the suspect to evade police.

112.    Upon information and belief, neither Miller nor any of his passengers, including Plaintiffs' and Plaintiffs' decedents, were accused or suspected of any violent crime at any time on April 24, 2024.

113.    Neither Miller nor any of his passengers, surviving or deceased, including Plaintiffs and Plaintiffs' decedents were in possession of a weapon.

114.    At all material times, Defendants knew that the red Ford Taurus contained multiple passengers, in excess of the vehicle's safe occupancy.

115.    At all material times, Defendants knew that occupants of the red Ford Taurus were not wearing their safety belts.

116.    Defendants knew or should have known that three of the passengers were minors at the time of the chase, including one who was visibly pregnant.

117.    None of the passengers were observed committing crimes of any kind.

118.    Despite the low danger to the public of allowing the driver of the red Ford Taurus

to remain at large with alleged equipment violations and the extremely high danger of engaging in a high-speed pursuit of a vehicle with multiple unbelted minor passengers in a busy residential and commercial area in the middle of the day, the Defendants engaged in the dangerous and ultimately fatal pursuit.

119.    Despite the lack of any factors presenting a risk to public safety if they terminated the pursuit, Defendants then continued the high-speed chase through traffic on busy thoroughfares, narrowly avoiding several crashes, before the deadly crash brought the chase to an end.

**Additional Facts**

120.    The Defendants' chase lasted approximately 6 minutes and 30 seconds, from the time Trooper Sgambato initiated the traffic stop, covering a distance of approximately 7 miles.

121.    At the time of the crash, PSP Trooper Korrubin had been stationed ahead of Miller and Troopers Eckman and Sgambato on eastbound Route 322, ready to lay down a spike strip, for approximately three minutes.

122.    Following Trooper Korrubin's announcement on the PSP radio 1:29:07 PM, Troopers Eckman and Sgambato were aware Trooper Korrubin was positioned nearby with a spike strip, which likely would have soon brought the chase to an end by disabling Miller's vehicles' tires.

123.    Upon information and belief, Trooper Korrubin's position was close enough that he was within sight of the crash location.

124.    Despite knowledge of this likely endpoint to the chase, Troopers Sgambato and Eckman continued to accelerate the chase to high speeds amid traffic.

125.    Miller's red Ford Taurus was fitted with a temporary license plate, which would have allowed for later investigation and apprehension of Miller.

126.    Although the PSP press release, **Exhibit A**, claims this license plate was "obscured by a tinted license plate cover," the same press release states that Trooper Sgambato was able to observe from his cruiser that Miller's vehicle had "expired inspection stickers" despite a "tinted front windshield" also obscuring those stickers.

127.    Consequently, Trooper Sgambato knew or should have known the license plate information for Miller's vehicle, which would have facilitated later investigation and apprehension of Miller.

128.    Despite having the ability to apprehend Miller at a later time, Troopers Sgambato and Eckman instead continued to engage in a dangerous, high-speed police pursuit through traffic.

129.    According to the PSP's Police Pursuit Reporting System, between 27.18% and 30.25% of police chases in Pennsylvania in the five years prior ended in a crash.



Source: https://www.policepursuits.pa.gov/ "Five-Year Trend Analysis," "Crash Rates"

130.    According to the PSP's Police Pursuit Reporting System, between 5–15 people per year died in crashes resulting from police chases in Pennsylvania in the five years prior.



Source: https://www.policepursuits.pa.gov/ "Five-Year Trend Analysis," "Total Fatalities"

131.    On or about February 13, 2024, PSP Troopers from Troop K Media Station, the same station to which Troopers Sgambato and Eckman were assigned, engaged in a similar high-speed chase of suspects accused of shoplifting from the Lululemon at The Shoppes at Brinton Lake, which ended in a crash.

132.    All of the suspects in that crash survived and were arrested. Neither Plaintiffs, Plaintiffs' decedents, nor any of the other occupants of Miller's red Ford Taurus were involved in the alleged February 13, 2024 theft.

133.    Defendants knew or should have known that their April 24, 2024 chase could have ended in the same or worse outcome.

**Defendants' Conduct and Damages**

134.    Despite knowing the significant safety risks inherent to the pursuit, and despite the absence of any information or reasonable belief that would justify a high-speed pursuit according to PSP Policies, Troopers Sgambato and Eckman undertook a high-speed chase in residential and commercial areas of Delaware County during mid-day rush hour, even though such a pursuit posed

a clear and significant risk to bystanders, motorists, and the occupants of the suspect vehicle, including Plaintiffs and Plaintiffs' decedents.

135.    Despite knowledge that the vehicle was occupied by more passengers than could safely be secured by seatbelts, knowledge that one of the passengers was pregnant, knowledge that none of the occupants had committed any crime prior to the traffic stop, and knowledge that none of the Plaintiffs or Plaintiffs' decedents had committed any crime even after Miller attempted to flee police officers, Troopers Sgambato and Eckman engaged in the dangerous pursuit.

136.    Troopers Sgambato and Eckman continued the chase for nearly three minutes after a back-seat passenger attempted to escape the vehicle at the intersection of Baltimore Pike and Route 322.

137.    Troopers Sgambato and Eckman continued the high-speed pursuit in violation of PSP Field Regulations requiring troopers to weigh the risk to public safety created by the pursuit against the risk to public safety created by allowing the suspect to evade police and discontinue a chase where the risk to public safety is greater. The risk to public safety was significant, as evidenced by the numerous cars on the road at the time, the multiple near-collisions of the Troopers' vehicles and Miller's vehicle with those cars as well as a pedestrian, and the dangerous speeds maintained throughout the crash. The risk to public safety posed by discontinuing the high-speed chase was minimal, because the occupants of the vehicle were accused (falsely) of only attempted non-violent shoplifting, because Trooper Korrubin was positioned nearby with a spike strip, which likely would have soon brought the chase to an end by disabling Miller's vehicles' tires, and because the license plate on Miller's vehicle would have allowed for later apprehension.

24

138.     By continuing the pursuit despite these dangers, and in violation of PSP field regulations, Troopers Sgambato and Eckman precipitated and continued a high-speed chase that caused Mr. Miller to lose control of his vehicle and crash. But for the conduct of Troopers Sgambato and Eckman, the crash would not have occurred, and consequently, Plaintiffs and Plaintiffs' decedents would not have sustained serious injuries and/or died.

139.     Troopers Sgambato and Eckman's conduct was a substantial factor and/or direct and proximate cause of the crash and the harm to Plaintiffs and Plaintiffs' decedents resulting therefrom.

140.     By engaging in an unjustified high-speed police pursuit in residential and commercial areas of Delaware County during mid-day rush hour, Troopers Sgambato and Eckman affirmatively used their authority as state actors to create and perpetuate a known and obvious danger to Plaintiffs and Plaintiffs' decedents, which rendered Plaintiffs and Plaintiffs' decedents vulnerable to a known, unsafe situation, within the meaning of the state-created danger doctrine under Section 1983 and its progeny.

141.     Defendants, Troopers Sgambato and Eckman, acting under the color of state law, affirmatively caused Plaintiffs and Plaintiffs' decedents to be deprived of the rights, privileges, and immunities granted to them by the Constitution.

142.     As a direct and proximate result of all of the Defendants' conduct, Plaintiff's decedent T.M. was caused to suffer the following:

      a.     Blunt-impact trauma of the head and torso;

      b.     Internal bleeding;

      c.     Fetal demise;

      d.     Altered level of consciousness;

e.  Pain and suffering;

f.  Emotional distress;

g.  Mental anguish;

h.  Disfigurement;

i.  Loss of life's pleasures;

j.  Other serious and severe injuries, the exact nature of which are unknown to Plaintiff at this time;

k.  Untimely death;

l.  Loss of care, guidance and tutelage;

m.  all damages allowable pursuant to 42 U.S.C. § 1988(a) under the Survival Act, 42 Pa. C.S.A. §8302, the applicable Rules of Civil Procedure and the decisional law interpreting the Survival Act, including damages for T.M.'s total estimated future earning power less her cost of personal maintenance, and/or pain and suffering endured by T.M. prior to her death, including, but not limited to, physical pain and suffering, mental pain and suffering, mental suffering, loss of life's pleasures, disfigurement, and humiliation; and,

n.  all damages allowed pursuant to 42 U.S.C. § 1988(a) under the Wrongful Death Act, 42 Pa. C.S.A. §8301, the applicable Rules of Civil Procedure and all decisional law interpreting the Wrongful Death Act, including damages for medical, funeral, and burial expenses, expenses of administration, monetary support T.M. would have provided during her lifetime, the value of services provided or which could have been expected

26

to have been performed in the future by T.M., and all pecuniary losses

suffered as a result of T.M.'s death.

143.     Accordingly, Plaintiff Octavia Motley, as Administratrix of the Estate of T.M., a

minor, deceased, brings this civil action against Defendants, pursuant to 42 U.S.C. § 1983 and

Pennsylvania state law, and seeks all appropriate damages and remedies cognizable by law.

144.     As a direct and proximate result of all of the Defendants' conduct, Plaintiff's

decedent Ka-Lyn Billups was caused to suffer the following:

a.       Blunt-impact traumatic injuries;

b.       Altered level of consciousness;

c.       Pain and suffering;

d.       Emotional distress;

e.       Mental anguish;

f.       Disfigurement;

g.       Loss of life's pleasures;

h.       Other serious and severe injuries, the exact nature of which are unknown to

         Plaintiff at this time;

i.       Untimely death;

j.       Loss of care, guidance, and tutelage;

k.       All damages allowable pursuant to 42 U.S.C. § 1988(a) under the Survival

         Act, 42 Pa. C.S.A. §8302, the applicable Rules of Civil Procedure and the

         decisional law interpreting the Survival Act, including damages for Ka-Lyn

         Billups's total estimated future earning power less her cost of personal

         maintenance, and/or pain and suffering endured by Ka-Lyn Billups prior to

her death, including, but not limited to, physical pain and suffering, mental pain and suffering, mental suffering, loss of life's pleasures, disfigurement, and humiliation; and,

l.    all damages allowed pursuant to 42 U.S.C. § 1988(a) under the Wrongful Death Act, 42 Pa. C.S.A. §8301, the applicable Rules of Civil Procedure and all decisional law interpreting the Wrongful Death Act, including damages for medical, funeral, and burial expenses, expenses of administration, monetary support Ka-Lyn Billups would have provided during her lifetime, the value of services provided or which could have been expected to have been performed in the future by Ka-Lyn Billups and all pecuniary losses suffered as a result of Ka-Lyn Billups' death.

145.    Accordingly, Plaintiff Erica M. Billups, as Administratrix of the Estate of Ka-Lyn S. Billups, deceased, brings this civil action against Defendants, pursuant to 42 U.S.C. § 1983 and Pennsylvania state law, and seeks all appropriate damages and remedies cognizable by law.

146.    As a direct and proximate result of all of the Defendants' conduct, minor-Plaintiff K.P. was caused to suffer the following:

a.    Thoracic compression fractures to the Left T1 vertebra facet, T3, T4, T5 vertebrae, and T6 vertebra superior endplate;

b.    Cervical C1 vertebra fracture;

c.    Posterior left 1st rib and lateral left 8th rib fractures;

d.    Left ankle fracture;

e.    Left clavicle fracture;

f.    Facial lacerations;

g.      Traumatic brain injury;

h.      Altered level of consciousness;

i.      Pain and suffering;

j.      Emotional distress;

k.      Mental anguish;

l.      Disfigurement;

m.      Loss of life's pleasures; and,

n.      Other serious and severe injuries, the exact nature of which are unknown to

        Plaintiff at this time.

147.    Accordingly, Plaintiff Krystal Pearson, as Parent and Natural Guardian of K.P., a

minor, brings this civil action against Defendants on minor-Plaintiff K.P.'s behalf, pursuant to 42

U.S.C. § 1983, and seeks all appropriate damages and remedies cognizable by law.

148.    As a direct and proximate result of all of the Defendants' conduct, Plaintiff Kemone

Manning was caused to suffer the following:

a.      Blunt-impact traumatic injuries;

b.      Burns;

c.      Long-term loss of mobility;

d.      Altered level of consciousness;

e.      Pain and suffering;

f.      Emotional distress;

g.      Mental anguish;

h.      Disfigurement;

i.      Loss of life's pleasures; and,

29

      j.     Other serious and severe injuries, the exact nature of which are unknown to Plaintiff at this time.

149.    Accordingly, Plaintiff Kemone Manning brings this civil action against Defendants on her behalf, pursuant to 42 U.S.C. § 1983, and seeks all appropriate damages and remedies cognizable by law.

### COUNT I – CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983
### All Plaintiffs v. All Defendants

150.    Plaintiffs incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

151.    At all relevant times, Defendants were individuals subject to suit pursuant to 42 U.S.C. § 1983.

152.    Defendants' constitutional torts are not governed or limited in any way by 42 Pa. C.S. § 8541, *et seq.* or 42 Pa. C.S. § 8521, *et seq.*

153.    At all relevant times, Defendants acted under color of state law.

154.    Defendants' conduct, as set forth above and herein, evinces a state-created danger.

155.    These events did not present Defendants with a hyper-pressurized environment, a true exigency, or a situation requiring hurried deliberation. Defendants had time to consider whether to engage in the inherently risky behavior described above.

156.    By engaging in an unjustified high-speed police pursuit in residential and commercial areas of Delaware County during mid-day rush hour, without sufficient justification under PSP pursuit policies, Defendants consciously disregarded a great risk of serious harm to the safety, bodily integrity, well-being, liberty, and substantive due process rights of Plaintiffs and Plaintiffs' decedents.

157.   Defendants acted in conscious disregard of the substantial and unjustifiable risk of causing harm to Plaintiffs and Plaintiffs' decedents, and their conduct was so egregious as to shock the conscience.

158.   By engaging in an unjustified high-speed police pursuit in residential and commercial areas of Delaware County during mid-day rush hour, without sufficient justification under PSP pursuit policies, Defendants' actions constituted an intent or purpose to cause harm to the public and/or deliberate indifference to the known and obvious consequences of their actions.

159.   Defendants' conduct, as set forth above, demonstrates that the harm caused to Plaintiffs and Plaintiffs' decedents was a foreseeable and a fairly direct result of Defendants' conduct.

160.   Defendants' conduct, as set forth above, demonstrates that Defendants unreasonably and unjustifiably placed Plaintiffs and Plaintiffs' Decedents in a foreseeably dangerous position.

161.   Defendants' conduct, as set forth above, affirmatively created an opportunity for harm to Plaintiffs and Plaintiffs' decedents that otherwise would not have existed. Plaintiffs' decedent was rendered more vulnerable to the danger than had Defendants not acted at all.

162.   At all times relevant to this litigation, Defendants were aware that Plaintiffs' decedent had a clearly established constitutional right to bodily integrity and a right to be free of the state created danger described herein.

163.   As a direct and proximate result of Defendants' unreasonable, unjustifiable, and unconstitutional conduct, Plaintiffs and Plaintiffs' d

164.   Decedents suffered the aforementioned harms, including the above-mentioned injuries and/or untimely death.

165.    Defendants' conduct, as set forth herein, violated the rights to life and liberty in the form of bodily integrity guaranteed by the Fourteenth Amendment to the United States Constitution, capable of legal remedy under 42 U.S.C. § 1983 and 1988.

**WHEREFORE**, Plaintiffs, Octavia Motley, as Administratrix of the Estate of T.M., a minor, deceased; Erica M. Billups, as Administratrix of the Estate of Ka-Lyn S. Billups, deceased; Krystal Pearson, as Guardian of Plaintiff K.P., a minor; and Kemone Manning respectfully requests that this Honorable Court enter Judgment in his favor and against Defendants, jointly and severally, in an amount in excess of any arbitration limit in the District Court for the Eastern District of Pennsylvania, including interest, plus Plaintiff's costs and attorney's fees, and punitive damages against all Defendants, as well as any other relief this Court deems just.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury as to all counts and all issues raised by this Complaint.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:     *David K. Inscho*

Date:  October 29, 2024

THOMAS R. KLINE, ESQUIRE
DAVID K. INSCHO, ESQUIRE
WYATT J. LARKIN, ESQUIRE
Tom.Kline@klinespecter.com
David.Inscho@klinespecter.com
Wyatt.Larkin@klinespecter.com
ATTORNEY ID #s:  28895, 90267, 334482
1525 Locust Street, Nineteenth Floor
Philadelphia, PA 19102
Phone: (215) 772-1000
Fax: (215) 772-1359
*Attorneys for Plaintiffs*

32